FILED
CLERK

12/19/2013 12:50 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X
MICHAEL CALLARI, individually and on behalf
of other persons similarly situated who were
employed by BLACKMAN PLUMBING
SUPPLY, INC., and/or any other entities affiliated
with or controlled by BLACKMAN PLUMBING
SUPPLY, INC.,

Plaintiffs,

-against-

BLACKMAN PLUMBING SUPPLY, INC.,
ROBERT MANNHEIMER, AS CO-EXECUTOR
OF THE ESTATE OF RICHARD BLACKMAN,
AND ROBERT A. TEPEDINO, AS CO-
EXECUTOR OF THE ESTATE OF RICHARD
BLACKMAN, and JOHN DOES #1–10,

Defendants.

-------------------------------------------------------- X

**MEMORANDUM OF**
**DECISION AND ORDER**
11-CV-3655 (ADS) (AKT)

**APPEARANCES:**

**Bee Ready Fishbein Hatter & Donovan, LLP**
*Attorneys for the Plaintiff and Opt-in Plaintiff George Ruggiero*
170 Old Country Road, Suite 200
Mineola, NY 11501
    By:  Robert Connolly, Esq., Of Counsel

**Certilman Balin Adler & Hyman, LLP**
*Attorneys for the Defendants*
90 Merrick Avenue
East Meadow, NY 11554
    By:  Douglas E. Rowe, Esq.
         James A. Rose, Esq.
         Sanjay V. Nair, Esq., Of Counsel

**SPATT, District Judge.**

On July 29, 2011, the Plaintiff Michael Callari ("the Plaintiff"), individually and on

behalf of other persons similarly situated, commenced this action against the Defendants

Blackman Plumbing Supply, Inc. ("BPS"), Richard Blackman ("Blackman") and John Does #1–

10.  Pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207 and 216, New York Labor Law ("NYLL") Article 19 § 663, NYLL Article 6 §§ 190 et seq. and 12 New York Codes, Rules and Regulations ("NYCRR") § 142-2.2, the Plaintiff seeks to recover allegedly unpaid overtime wages owed to him and all similarly situated persons who are presently or were formerly employed by BPS and/or any entities affiliated with or controlled by BPS, Blackman and John Does #1–10.

On June 21, 2013, following the passing of Blackman, the parties entered into a stipulation substituting Robert Manheimer ("Manheimer") and Robert A. Tepedino ("Tepedino"), as Co-Executors of the Estate of Blackman, as defendants in this action, in place and instead of Blackman.  The Court "so ordered" this stipulation on June 24, 2013.  In addition, on September 28, 2012, George Ruggerio ("Ruggerio") opted-in as a plaintiff.  He is the only opt-in plaintiff in this action.

Presently before the Court is a motion by BPS, Manheimer and Tepedino (collectively, the "Defendants") for summary judgment dismissing the Complaint.  The Defendants argue that summary judgment should be granted in their favor because (1) the Plaintiff was an exempt employee under the FLSA; and (2) the Plaintiff and Ruggiero's federal claims are time-barred and Ruggiero's federal and state law claims were waived.  The Defendants also argue that the Court should decline to exercise supplemental jurisdiction over the Plaintiff's remaining state law claims and that, in any event, even if the Court did retain jurisdiction of the case, the Plaintiff's collective allegations should be dismissed because the Plaintiff never filed for class certification or conditional certification and have now waived his right to do so.

As an initial matter, the Court notes that the Plaintiff, in opposition to the Defendants' motion, included an almost forty page attorney declaration containing factual allegations in

addition to his twenty-six page memorandum of law, in violation of this Court's Individual Rule VI.B.i, which limits the length for a memorandum of law in opposition to twenty-five pages. Accordingly, as the Plaintiff has attempted to circumvent this Court's rule on page limits by supplementing the Plaintiff's memorandum of law with the attorney declaration, the Court declines to consider the attorney declaration.   See Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 997 F. Supp. 340, 346 n.1 (E.D.N.Y. 1998).

For the reasons set forth below, the Court grants the Defendants' motion for summary judgment as to the opt-in Plaintiff Ruggiero's claims, but denies the Defendants' motion for summary judgment as to the Plaintiff Callari's claims.

## I.  BACKGROUND

### A.  Underlying Facts Pertaining to the Individual Plaintiff Callari

The Defendant BPS is a company which sells plumbing, heating and cooling supplies from retail and wholesale stores and locations.  From 1989 until his last day of employment, July 15, 2010, the Plaintiff was employed by BPS as an Assistant Branch Manager at BPS's Mineola branch.  While working as an assistant manager, the Plaintiff was a salaried employee and BPS classified the Plaintiff as exempt from overtime compensation allegedly based on his actual duties and responsibilities at the Mineola branch.

The Plaintiff was originally hired by BPS in approximately May of 1981.  At the time he was hired, he was responsible for doing pricing, which he did for about two years, before slowly moving over to sales.  While working as an inside sales representative, the Plaintiff would enter sales orders that were placed over the phone.  With respect to the pricing of BPS's products, the prices were set in the computer and the Plaintiff did not have the ability to change them.  In the event a question about prices arose or someone was seeking a major price adjustment on a

product, the Plaintiff would generally speak to the manager.  As the Plaintiff explained at his

deposition,

> [i]f it was a pricing question and it was kind of a no brainer, then I
> would help them with it.  If it got into a situation where it might
> involve selling it at a very low price, if the manager was not there,
> I would call purchasing or speak to somebody.  Basically, to get
> the okay for the price.

(Rose Decl., Exh. C, pg. 20–21.)

The Plaintiff also reviewed opened orders and pending orders, but only when the

manager was not there and he only had limited authority to adjust an order.  Further, he attended

training sessions to increase his knowledge of the products that BPS was selling.  His other

responsibilities as a sale representative included processing returns and issuing credits to

customers, so long as these transactions did not involve "an extraordinary amount of material,"

in which case the Plaintiff would have to consult with the manager first before proceeding.

(Rose Decl., Exh. C, pg. 23.)

In addition, when the Mineola branch was crowded with customers, the manager would

direct the Plaintiff to assist customers at the counter.  On some occasions, when the Plaintiff was

working with relatively new salespersons, the Plaintiff would suggest to these other salespersons

that they assist those customers who were waiting to be helped.  However, although he made

suggestions, the Plaintiff did not have authority over anyone in the Mineola branch while he was

working as a salesperson.

The Plaintiff remained in sales until he became Assistant Branch Manager for the

Mineola branch in 1989.  Just a few months prior to that time, Andy Rothenbucher

("Rothenbucher") had been brought in as manager and Marc Wolff ("Wolff") as assistant

manager.  As a result, the Plaintiff advised BPS's then-general manager Kevin Sossin ("Sossin")

that he intended to leave BPS because he believed he had deserved the assistant manager position.  However, Wolff ended up leaving BPS after only two or three months because he did not get along with Rothenbucher.  Sossin then offered the Plaintiff the job as assistant manager to replace Wolff, which the Plaintiff accepted.  No one was hired or brought in to take the Plaintiff's place as a salesperson.

According to the Plaintiff, when he became assistant manager, he did not receive any training in connection with his promotion.  Moreover, he claims that his responsibilities generally did not change once he became assistant manager except when Rothenbucher was not there.  On those occasions, the Plaintiff would handle cash reports for Rothenbucher, which at the time were very small and simply involved clearing the drawer to check if they were over or under in relation to the previous day's sales.  Nevertheless, the Plaintiff could not make major decisions, such as firing an employee, without the manager there.  In those cases when the manager was not available, the Plaintiff would speak to the corporate office about the issue and comply with their decision.

As the Plaintiff stated, "my job [as assistant manager] was to help [the manager] out, but sales were my number one job."  (Rose Decl., Exh. C, pg. 29.)  In this regard, the Plaintiff's responsibilities increased in that he performed whatever job-related tasks the manager asked of him, even if those tasks did not pertain to sales.  The Plaintiff did not receive a pay increase beyond the normal pay increase he received every year while in sales, nor did he receive letterhead or additional space at the Mineola branch.  However, he did receive business cards for the first time.  On the business cards, his title was listed as assistant manager.  He also introduced himself as the assistant manager to customers when they asked him who he was or what he was doing.

Generally, the manager directed the employees in sales with respect to their jobs.  Only when the manager was unavailable did the inside salespeople come to the Plaintiff.  In this regard, for instance, the Plaintiff was only responsible for taking attendance for the branch when the manager was not there and when the manager returned, he would inform him of who was excessively late to work.  He would also review the time sheets of employees if the manager was out sick or on vacation and notify the corporate office if there was a notation that needed to be made, such as if the employee had worked overtime but it was not noted in the computer system.  Moreover, if one of the employees had a serious emergency and there was no time to check with the manager, the assistant manager would give the employee permission to leave early for the day.  Further, the Plaintiff asked the employees who wanted to work on Saturday and set the Saturday schedule.

With respect to discipline, on the rare occasion that an employee behaved unprofessionally with a customer and the manager was not there, the Plaintiff would speak to the employee about the matter.  Further, if he saw an inside salesperson selling a product for less than he was supposed to or at an unreasonably high price, the Plaintiff would question the employee about it.  Typically at the direction of the manager or when the manager was unavailable, he also would advise the other employees to help one another out with customers if they were not busy; to correct the prices of products if they made blatant errors; to answer the phone quickly; and to have any arguments in the back of the branch office outside of the earshot of customers.  However, the Plaintiff never issued verbal warnings to other employees and he had no authority to write up employees or to hire or fire them.  Rather, discipline was the sole responsibility of the manager.

At his deposition, the Plaintiff explained "when the manager was there, he would do the supervising.  But the assistant manager who usually was more experienced could answer questions and so on and so forth."  (Rose Decl., Exh. C, pg. 36.)  Nevertheless, when an inside salesperson had a question about a custom or practice of the branch, he "normally talk[ed] to the manager unless the manager was busy" in which case then they would speak to the assistant manager.  (Rose Decl., Exh. C, pg. 37.)  The Plaintiff expressed frustration that the salespeople did not respect him or treat him in the same way as the manager and that he had more difficulty in controlling the employees when the manager was not there.

The manager and operations were also in charge of making sure the grounds were clean, maintaining the signage in the building, snow removal and making sure the lighting was proper in the building.  On the other hand, the Plaintiff, although the assistant manager, had no such responsibilities and would only report to the manager if there was a problem of that nature that needed to be fixed.  Further, the Plaintiff would advise the manager if he thought the branch was not staffed properly, but it remained the manager's duty to contact corporate to get additional personnel for the branch.  However, other employees of the branch also advised the manager about the branch being understaffed.

Although the Plaintiff asserted that his duties did not significantly change once he became assistant manager, he did testify as to a few new responsibilities with which he was tasked as a result of the position.  For example, only the Plaintiff, as assistant manager, and the manager had the power to void tickets, which was in effect voiding a pending sales transaction.  Moreover, the Plaintiff, along with the manager and the head of operations, was responsible for opening and closing the Mineola branch.  This involved opening and closing the door; shutting off and turning on the alarm; and turning on and off the lights.  Only the Plaintiff, the manager

and two other people had a key to the Mineola branch.  In addition, the Plaintiff, the manager and head of operations had the alarm code for the branch's security system, as well as the alarm code for the BPS warehouse located across the street.  Employees who worked in the branch's showroom also had the alarm code for the branch, but not the one for the warehouse.  In the event the branch's alarm went off, the alarm company would always call the manager first, but if he was not available, they would then call the Plaintiff.  However, the Plaintiff only had the responsibility of receiving the calls from the alarm company for about two to three years in the mid-1990s.

Further, only the Plaintiff, the manager and the head of operations had the combination to the branch's safe.  After opening the branch, the Plaintiff would open up the safe and take out the two cash drawers.  Generally, just the Plaintiff and the manager handled the cash drawers.  The safe would remain closed during the working day.

The Plaintiff worked with Rothenbucher for about four years until about the early 1990s.  When Rothenbucher left, Tony DiCarlo ("DiCarlo") became manager of the Mineola branch and served as manager for seven years.  The Plaintiff remained the assistant manager and his job responsibilities mostly did not change.  In this regard, his basic duties still related to sales, although occasionally DiCarlo would ask the Plaintiff to do inventory, which involved organizing the branch's products and tagging the items so that they could be properly placed and stored.  Sometimes an employee who worked at the branch office's counter or in the stock room would assist the Plaintiff with the inventory.  Also, with respect to customer service, if a customer complained to him about one of the inside salespeople, the Plaintiff would speak to the employee and then deal with the customer himself.

In about 1996 or 1997, DiCarlo was replaced as the Mineola branch manager by Joey Cullen ("Cullen").  The Plaintiff worked with Cullen for approximately five or six years.  At the time Cullen became manager, the Plaintiff had wanted to be manager, although he never verbalized it.  During Cullen's time as manager, in about 1997, the Plaintiff helped him maintain proper inventory levels at the Mineola branch by making line point entries in the computer system requesting additional quantities of products in which the branch was running low.  The Plaintiff was not aware of any of the sales employees making line point entries.

Cullen eventually left as manager and Mike Horizon ("Horizon"), who had been an inside salesperson, replaced him.  Thereafter, about 2003 or 2004, Edward Cuff ("Cuff") became manager.  Cuff had previously worked for BPS's purchasing department and ended up serving as manager for the Mineola branch for three years.  By the time Cuff came in as manager, the Plaintiff no longer wanted to be manager because the job had become "very, very difficult." (Rose Decl., Exh. C, pg. 53–54.)

In this regard, beginning in about 2000, the Mineola branch did not have enough personnel and many of the employees they did have were new.  Thus, there was "less people and more and more responsibility was thrown on the manager's shoulders."  (Rose Decl., Exh. C, pg. 54.)  The Plaintiff's position was also impacted by the shortage of personnel.  For example, although he was entitled to a one-hour lunch, the Plaintiff often ate lunch at his desk so that he could continue working, since the branch was so busy.

The Plaintiff's responsibilities as assistant manager remained the same when Cuff was manager.  The Plaintiff continued to basically do sales, but was there to assist Cuff for whatever tasks he needed to be done.  While the Plaintiff felt that Cuff ran the Mineola branch well, he disagreed with Cuff's philosophy on pricing.  More particularly, Cuff turned to BPS's

purchasing department for questions of pricing, while the Plaintiff believed that they should instead be looking to the competition and the market in order to determine pricing.

When Cuff was manager, opt-in Plaintiff Ruggiero, who was an inside salesperson at the time, was terminated as an employee of BPS.  According to the Plaintiff, the decision to fire Ruggiero was not the manager's, but came from the corporate office.  Cuff came to the Plaintiff and told him that he thought the corporate office's decision to terminate Ruggiero's employment was "terrible."  (Rose Decl., Exh. C, pg. 181.)  The Plaintiff thought the decision was "insane," because Ruggiero had twenty-five years of experience.  (Rose Decl., Exh. C, pg. 181.)  While the Plaintiff admitted that Ruggiero had a few drawbacks with respect to answering the phones, which he conveyed to Cuff, the Plaintiff did not feel that he deserved to be fired.

Neither the manager nor the Plaintiff participated in the decision to fire Ruggiero. However, both were present when Ruggiero was terminated.  In this regard, Cuff, the Plaintiff and Ruggiero met in Cuff's office and Cuff informed Ruggiero that he had been fired.  The Plaintiff described the meeting as "a terrible emotion thing for . . . everybody" because the three of them were friends and neither Cuff nor the Plaintiff had anything to do with the decision, as it came from the corporate office.  (Rose Decl., Exh. C, pg. 182.)  Since it was such a difficult meeting, the Plaintiff explained that he was in the room when Cuff notified Ruggiero to support both Cuff and Ruggiero.

Also when Cuff was manager, the Plaintiff's friend and fellow employee at the Mineola branch, Pat Montana ("Montana") was promoted to sales.  Montana started his employment at the Mineola branch in the warehouse and then worked in the back doing stock and at the counter before moving to sales.  According to the Plaintiff, he mentioned to Cuff that Montana was interested in working in sales and probably expressed to Cuff that he thought he had the right

skill sets to learn to be a good inside salesperson.  Nevertheless, the Plaintiff asserts that he never recommended Montana for a promotion to Cuff.  Rather, Cuff had liked Montana and therefore decided to promote him to sales.  The Plaintiff claims he never made any recommendations to the manager about who should receive a promotion.

Montana did not have a lot of experience in sales when he started as an inside salesperson, and Cuff sat him next to the Plaintiff, who trained him in sales and how to sell the different products offered by BPS.  In addition, the Plaintiff  taught Montana how to complete the paperwork for sales.  Ruggiero also helped train Montana.  Montana is the only employee that the Plaintiff recalls training.

Cuff eventually left the Mineola branch to manage the Huntington Branch and Paul Monahan was brought in to serve as manager for the Mineola branch.  Again, the Plaintiff's duties and responsibilities as assistant manager did not change and he was only "the boss" when the Cuff was not there.  (Rose Decl., Exh. C, pg. 61.)  However, because the branch had less staff and also less experienced staff, more customers came to the Plaintiff and the Plaintiff was constantly on the phone making sales.  In this regard, the Plaintiff estimated that at the time, there were more than ten people working at the Mineola branch, including sales and employees working at the counter, in the office and in the warehouse.

While Monahan was manager, he witnessed the Plaintiff getting into a disagreement with another employee, Eric Finger ("Finger"), who worked in operations.  According to the Plaintiff, he and Finger "had a personality clash" and would engage in verbal arguments, because Finger had a lack of respect for him.  (Rose Decl., Exh. C, pg. 186.)  As a result, the Plaintiff talked to Monahan about Finger and Monahan, in turn, addressed the situation with Finger.

In or about 2009, the United States Department of Labor ("DOL") launched an investigation into BPS's labor practices. In this regard, on March 11, 2009, the DOL audited BPS, which resulted in BPS entering into a written agreement with the DOL to pay certain employees back wages that were owed to them pursuant to a payment schedule that was set by the DOL. (Schneider Decl., ¶ 2.) However, on or about June 11, 2009, the Plaintiff declined to accept the settlement offered by BPS pursuant to its agreement with the DOL. (Schneider Decl., ¶ 18.)

On July 15, 2010, after giving three-month's notice, the Plaintiff retired from his job with BPS. Apparently, BPS intended to replace the Plaintiff as assistant manager, but the Plaintiff never trained anyone to replace him when he left. At the time he retired, the Plaintiff was receiving an $80,000 salary for working a work week in excess of forty hours. Within five years of his retirement, the Plaintiff worked approximately fifty hours a week, which was about five days a week, ten hours a day, from 7:00 a.m. to 5:00 p.m. The Plaintiff also worked two Saturdays per month. As for his lunch hour, as stated above, the Plaintiff never took his one-hour lunch, but instead would take a twenty minute or half hour break to have his sandwich in the back.

On July 29, 2011, the Plaintiff commenced this collective action litigation by filing a Complaint in this Court on behalf of himself individually and others similarly situated. On April 30, 2012, in connection with the Plaintiff's motion to compel responses to interrogatories, the Plaintiff filed a declaration in which he stated "[i]n spite of the [DOL] investigation, the Defendants continued to misclassify me and other inside sales and customer service representatives as exempt from overtime eligibility and further, I and the other similarly situated employees continued to work in excess of forty (40) hours per week, but we were not paid

overtime." (Dkt. No. 16-3, ¶ 8.) Further, the Plaintiff indicated that he was "the above named Plaintiff in this action." (Dkt. No. 16-3, ¶ 1.) Thereafter, on April 22, 2013, the Plaintiff formally filed his consent to join the collective action that he had brought.

**B.  Underlying Facts Pertaining to Opt-in Plaintiff Ruggiero**

Ruggiero is a former employee of BPS. He has approximately forty years of experience in the plumbing supply industry, which included his time at BPS as well as working at another plumbing supply company before joining BPS. In about 1995, Ruggiero began his employment with BPS as an inside salesperson and was assigned to the Queens Village branch. At the time, the manager there was Steven Klein ("Klein"), who Ruggiero worked under for about five years. Following Klein, in 2000, Derick Price ("Price") became the manager of the Queens Village branch and Ruggiero received the title of assistant manager. As assistant manager, Ruggiero worked with Price for about two years.

In December of 2002, Ruggiero asked for a transfer because he was dissatisfied with the additional obligations he had as assistant manager. In this regard, he was unhappy that he was frequently required to stay past 5:00 p.m. in order to close the Queens Village branch even though he was not receiving additional compensation for that time. He was also unhappy in that he had to take phone calls from the alarm security company in the early hours of the morning, which he found disruptive to his private life and family.

Thus, after working at the Queens Village branch for approximately seven years, Ruggiero was transferred to the Mineola branch and designated an inside salesperson. When he first started there, the Mineola branch had thirteen employees. Cullen was the manager, while Ruggiero and Horizon held sales positions. In addition, according to Ruggiero, the Plaintiff also held a sales position, even though he had the title of assistant manager. Eventually, Horizon was

promoted to manager and Montana replaced him as an inside salesperson.  After Horizon, Cuff

became manager.

 For most of his time at the Mineola branch, Ruggiero worked five days a week, from 7:00

a.m. to 5:00 p.m.   He also worked Saturdays, from 8 a.m. to 12:00 p.m.  As to lunch, Ruggiero

was unable to take an hour or even a half hour to go out for lunch, but generally ate his lunch at

his desk.  Ruggiero took no breaks during the day.  However, beginning in January of 2009,

Ruggiero was told to take a half hour for lunch and to start at 7:30 a.m. instead of 7:00 a.m.

Nevertheless, despite being told to take a half hour for lunch, Ruggiero claims that would only

take five to ten minutes for lunch.

 Ruggiero was one of about three employees at the Mineola branch who was doing inside

sales, along with the Plaintiff and Montana.  His primary duty was "salesman" as well as

"cashier, counterman, yard man, customer relations [and] sweep[ing] the floors."  (Rose Decl.,

Exh. D, pg. 51).  In this regard, his responsibilities included

> doing quotes, customer takeoffs, contacting with engineers on
> different products, doing sizings, rough layouts for cast iron,
> layouts for bathrooms, time to time reading blueprints and getting
> the results for the tradesmen and dealing with the salesmen, the
> outside salesmen from the manufacturers who come in to see us . .
> . clean[ing] up the bathroom[,] . . . work[ing[ at the counter, . . .
> [and] as material was sold, if needed, [going] out to the yard and
> help[ing[ get the material for the customers.

(Rose Decl., Exh. D, pg. 18.)

 Ruggiero did not open or close the branch; have the combination to the safe; maintain

sales records for the branch; have any involvement in maintaining inventory levels; issue rebate

refunds; have the ability to void tickets for pending orders; handle employee complaints, daily

cash receipts or edit reports; or direct, supervise or discipline other employees at the Mineola

branch.  He also was never designated as a representative for the Mineola branch to any alarm company.

While Ruggiero had access to the Mineola branch computer system, his access was limited to viewing "the inventories, sales tickets, processing the orders, processing quotations [and] net costing on product."  (Rose Decl., Exh. D., pg. 23.)  Unlike the Plaintiff, he could not void tickets or access to cash reports.  If Ruggiero had a customer who wanted a ticket voided, he would go to the manager or the Plaintiff and explain the situation so that they would void the ticket.  Similarly, if Ruggiero felt a customer should receive a price adjustment, Ruggiero would bring up the issue with the manager, who would make the adjustment but only if he agreed with Ruggiero that it was appropriate.  Sometimes Ruggiero would speak to the Plaintiff first about the price adjustment and then the two of them would bring it to the manager for final approval. With respect to returns on cash sales, the Plaintiff was able to perform those transactions himself, but was expected to get approval from either the manager or the Plaintiff before doing so. Refunds, price adjustments and the voiding of tickets occurred on a daily basis at the Mineola branch.

Ruggiero would also bring inventory shortages to the attention of the manager and the Plaintiff so they could contact the corporate office about restocking.  Further, he gave the manager and the Plaintiff his input as to the merchandise that should be sold and the quantities needed.  However, most decisions concerning products came from the corporate office.  In addition, he handled customer complaints and warrantee claims.  Regarding the warrantee claims, Ruggiero filled out forms for the manufacturer, contacted the manufacturer to get its approval before sending the material back and replacing the material for the customer.  Ruggiero was permitted to perform this task without approval from management.  Moreover, Ruggiero had

authority to make decisions with regard to defective merchandise.  This authority involved

contacting the manufacturer and informing it about the product; explaining how the product was

defective; and giving the manufacturer the product's serial number.  Ruggiero would then wait

for the manufacturer's decision.

Ruggiero's last day working at the Mineola branch was March 9, 2009, when he was laid

off due to alleged economic reasons.  In this regard, Cuff and the Plaintiff called Ruggiero into

Cuff's office, where Cuff informed Ruggiero that his employment with BPS had been

terminated.  Their meeting lasted about fifteen minutes.  Afterward, Ruggiero contacted the

corporate office to request severance pay, as well as his vacation pay, but was eventually told

that he would receive neither.  At the time of his termination, Ruggiero had worked for the

Mineola branch for about six years and was earning a weekly salary of $1,400.  In the year 2008,

his salary had been $1,365.  In the last six years of his employment, he never received overtime

nor did he receive compensation for his weekend hours.

Ruggiero questioned whether the economic reasons were justified, because within a week

of his lay-off, BPS purchased a three-branch supply house located in New Jersey.  He also felt

that BPS was discriminating against him due to his age.  As such, Ruggiero brought a complaint

first to the New York State Unemployment Board and then to the New York State Labor Board.

While the Labor Board investigated Ruggiero's complaint, the Unemployment Board approved

Ruggiero's request for unemployment benefits.  Then, in about April or May of 2009, Ruggiero

learned that BPS was being investigated by the DOL in connection to back wages it allegedly

owed to the salespeople, since they were not supposed to be considered salary employees.

Ruggiero ended up receiving two checks in connection to the back wages he was

allegedly owed by BPS.  First, he received a check in the amount of approximately $725 from

the New York State Labor Board, which was sent to him in the mail.  Second, on August 7,

2009, as a result of the DOL investigation, he received a check in the amount of $1,590.12 from

BPS.  Ruggiero went to BPS's office in Bayport to pick up the check from BPS human resource

employees Sue Cook ("Cook") and Mark Schneider ("Schneider").  Before receiving the check,

Ruggiero signed a WH-58 Form entitled "Receipt for Payment of Lost or Denied Wages,

Employment Benefits, or Other Compensation" ("WH-58 Form").  The WH-58 Form included a

"NOTICE TO EMPLOYEE UNDER THE FAIR LABOR STANDARDS ACT," which stated

> Your acceptance of back wages due under the Fair Labor
> Standards Act means that you have given up any right you may
> have to bring suit for back wages under Section 16(b) of that Act.
> Section 16(b) provides that an employee may bring suit on his/her
> own behalf for unpaid minimum wages and/or overtime
> compensation and an equal amount as liquidated damages, plus
> attorney's fees and court costs.  The statute of limitations for Fair
> Labor Standards Act suits requires that a suit for unpaid minimum
> wages and/or overtime compensation must be filled within 2 years
> of a violation of the Act, except that a suit for a willful violation
> must be filed within 3 years of the violation.  Do not sign this
> receipt unless you actually have received payment of all back
> wages due.

(Rose Decl., Exh. F.)  However, Ruggiero claims he did not read the document before signing it.

Ruggiero kept the money from both checks.

     In or about September 20, 2012, Ruggiero consented to join the collective action that had

been brought by the Plaintiff.   Ruggiero seeks to collect unpaid wages and damages from the

Defendants.  In addition, on October 25, 2013, in connection with the Plaintiff's opposition to

the Defendants' motion for summary judgment, Ruggiero filed a declaration in which he asserts

that by signing the WH-58 Form he did not waive his rights to bring a lawsuit against them for

overtime wages, liquidated damages and attorney fees.  (Ruggiero Decl., ¶ 3.)  Rather, although

he did not assert this during his deposition, Ruggiero argues that prior to signing the WH-58

Form, he was not informed of his rights and remedies under the FLSA and that his signature was obtained by fraud and coercion on the part of BPS.  (Ruggiero Decl., ¶ 3.)  In this regard, he alleges that Cook and Schneider misrepresented his options in that they advised him that he should take the check because he would receive nothing otherwise.  He further claims that he never received a copy of the WH-58 Form.  However, according to Schneider, he gave a copy of the WH-58 Form to Ruggiero on the date he signed it.  (Schneider Decl., ¶ 13.)  He also denies making any misrepresentations to Ruggiero.

## II.  DISCUSSION

### A.  Legal Standard on a Fed. R. Civ. P. 56 Motion for Summary Judgment

It is well-settled that a motion for summary judgment under Fed. R. Civ. P. 56 may be granted by the Court only if the evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("Rule 56(c) provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law."); Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) ("Summary judgment is appropriate where there exists no genuine issue of material fact and based on the undisputed facts, the moving party is entitled to judgment as a matter of law.") (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)) (internal brackets omitted).  However, the Court must endeavor to resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion for summary judgment.  Anderson, 477 U.S. at 247–48.

Once a party moves for summary judgment, the non-movant must come forward with specific facts showing that a genuine issue exists to avoid the motion being granted.  West-Fair

Elec. Contractors v. Aetna Cas. & Surety Co., 78 F.3d 61, 63 (2d Cir. 1996); see also Western

World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (quoting Fed. R. Civ. P.

56(e)). Typically, a genuine issue of material fact exists only if "a reasonable jury could return a

verdict for the nonmoving party."  Anderson, 477 U.S. at 248; see Vann v. New York City, 72

F.3d 1040, 1049 (2d Cir. 1995). In addition, mere conclusory allegations, speculation or

conjecture will not avail a party resisting summary judgment.  See Kulak v. City of New York,

88 F.3d 63, 71 (2d Cir. 1996).

## B.  Legal Standard under the FLSA

The FLSA sets minimum requirements for wage and overtime payments and prohibits

employment for more than a specified number of hours per week without proper overtime

compensation.  29 U.S.C. §§ 201–13.  In particular, an employee who works in excess of forty

hours a week must be compensated for each hour worked in excess of forty hours "at a rate not

less than one and one-half times the regular rate at which he is employed."  Id. at § 207(a)(1).

However, certain employees, including those who are employed in "a bona fide executive,

administrative, or professional capacity," are exempt from this overtime compensation

requirement.  Id. at § 213(a)(1).  Nevertheless, "'because the FLSA is a remedial act, its

exemptions . . . are to be narrowly construed,' and the burden rests on the employer to prove that

a particular employee is exempt from the Act's requirements."  Havey v. Homebound Mortgage,

Inc., 547 F.3d 158, 163 (2d Cir. 2008) (quoting Martin v. Malcolm Pirnie, Inc., 949 F.2d 611,

614 (2d Cir. 1991)).

The FLSA does not define the terms "executive," "administrative," or "professional" for

purposes of the exemption, but directs the Secretary of Labor to do so by regulation.  29 U.S.C.

§ 213(a)(1).  The Secretary's regulations have the force of law, and are generally given

controlling weight.  See Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79

(1997) ("Because the salary-basis test is a creature of the Secretary's own regulations, his

interpretation of it is . . . controlling unless 'plainly erroneous or inconsistent with the

regulation.'") (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.

Ct. 1835, 104 L. Ed. 2d 351 (1989)).

      Relevant here, under the regulations promulgated by the DOL,

> [t]he so-called executive exemption alleviates employers from the
> overtime requirements of the labor laws for employees (1) who are
> compensated on a salaried basis at a rate no less than $455 per
> week; (2) whose primary duty is management of the enterprise in
> which the employees are employed or of a customarily recognized
> department or subdivision thereof; (3) who customarily and
> regularly direct the work of two or more other employees; and (4)
> who possess the authority to hire or fire other employees or whose
> suggestions and recommendations as to the hiring, firing,
> advancement, promotion or any other change of status of other
> employees are given particular weight.

Indergit v. Rite Aid Corp., No. 08 Civ. 9361 (JPO), 2013 WL 5380253, at *3 (S.D.N.Y. Sept. 26,

2013) (quoting 29 C.F.R. § 541.100(a)(1)–(4)) (internal brackets and quotation marks omitted).

See also Mullins v. City of New York, 653 F.3d 104, 107 (2d Cir. 2011).  "Management" is

defined by the DOL regulations as including

> activities such as interviewing, selecting, and training of
> employees; setting and adjusting their rates of pay and hours of
> work; directing the work of employees; maintaining production or
> sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of
> recommending promotions or other changes in status; handling
> employee complaints and grievances; disciplining employees;
> planning the work; determining the techniques to be used;
> apportioning the work among the employees; determining the type
> of materials, supplies, machinery, equipment or tools to be used or
> merchandise to be bought, stocked and sold; controlling the flow
> and distribution of materials or merchandise and supplies;
> providing for the safety and security of the employees or the

> property; planning and controlling the budget; and monitoring or
> implementing legal compliance measures.

29 C.F.R. § 541.102.  See Mullins, 653 F.3d at 107.

As to the "administrative exemption," FLSA's overtime requirements do not apply to

> those employees who (1) are compensated on a salary or fee basis
> at a rate no less than $455 per week; (2) whose primary duty is the
> performance of office or non-manual work directly related to the
> management or general business operations of the employer or the
> employer's customers; and (3) whose primary duty includes the
> exercise of discretion and independent judgment with respect to
> matters of significance[.]

Indergit, 2013 WL 5380253, at *3.

In addition, the DOL regulations "also provide for a 'combination exemption,' which applies to those employees who 'perform a combination of exempt duties as set forth in the regulations[.]'"  Id. (quoting 29 C.F.R. § 541.708).  In this regard, "employees whose primary duty involves a combination of exempt administrative and exempt executive work may qualify as exempt workers, despite the fact that their duties fit neatly within neither the executive nor the administrative exemption."  Id.

According to the DOL Regulations, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  In determining whether the exempt work is the employee's primary duty, factors that can be considered are (1) "the relative importance of the exempt duties as compared with other types of duties"; (2) the amount of time spent performing exempt work"; (3) the employee's relative freedom from direct supervision"; and (3) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  Id.  See Clougher v. Home Depot U.S.A., Inc., 696 F. Supp. 2d 285, 290 (E.D.N.Y. 2010).  With respect to time spent performing exempt work, while "employees who spend more than 50

percent of their time performing exempt work will generally satisfy the primary duty requirement[,] [t]ime alone [ ] is not the sole test" and exempt employees need not spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b).  "The question of what an employee's duties are 'is one of fact, but the question of whether those activities' fall into an FLSA exemption is a question of law."  Klein v. Torrey Point Group, LLC, No. 12 Civ. 1190(KPF), 2013 WL 5761401, at *3 (S.D.N.Y. Oct. 23, 2013) (quoting Chenensky v. New York Life Ins. Co., No. 07 Civ. 11504(WHP), 2010 WL 2710586, at *2 (S.D.N.Y. June 24, 2010)).

Of importance, with respect to assistant managers, the DOL Regulations provide the following guidance:

> assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

A plaintiff bringing a claim for overtime compensation under the FLSA must do so "within two years after the cause of action has accrued, unless a plaintiff can show that a defendant's violation of the [FLSA] was willful, in which case a three-year statute of limitation applies."  Solis v. SCA Restaurant Corp, 938 F. Supp. 2d 380, 393 (E.D.N.Y. 2013) (citing 29 U.S.C. § 255(a)).  "Courts have held that for the purposes of establishing the statute of limitations under the FLSA, a new cause of action accrues with each payday following an allegedly unlawful pay period."  Lee v. ABC Carpet & Home, 236 F.R.D. 193, 199 (S.D.N.Y.

2006); see also 29 C.F.R. § 790.21(b) ("[A] cause of action under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation and for liquidated damages 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends.").

With respect to the three-year statute of limitation, "[f]or an employer's actions to be willful, the employer must have 'either known or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA.'" Id. (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115, (1988)) (internal brackets omitted). "Plaintiffs bear the burden of proof on the issue of willfulness." Colella v. City of New York, No. 07 Civ. 6312(LAP), 2013 WL 6331725, at *13 (S.D.N.Y. Dec. 5, 2013) (citing Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir.2009)).  The question of willfulness is generally left to the trier of fact.  Solis, 938 F. Supp. 2d at 393 (collecting cases).

However, "[c]ollective actions under the FLSA," like the present case, "have special requirements for determining when each individual plaintiff shall be deemed to have commenced his or her action[.]"  Colella v. City of New York, 2013 WL 6331725, at *13.  In this regard, 29 U.S.C. § 256 provides that an FLSA action

> shall be considered commenced in the case of any individual claimant [ ] (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or (b) if such written consent was not so filed or if his name did not so appear–on the subsequent date on which such written consent is filed in the court in which the action was commenced.

See also Colella, 2013 WL 6331725, at *13; Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 449 (S.D.N.Y. 2011) ("In a collective action suit such as this, the statute of limitations period continues to run with respect to each potential plaintiff's collective action

claim until that plaintiff files the written consent form opting into the suit.").  Despite this, "the

court may apply equitable tolling 'as a matter of fairness where a [party] has been prevented in

some extraordinary way from exercising his rights.'"  Whitehorn, 767 F. Sup.. 2d at 449 (quoting

Iavorski v. United States I.N.S., 232 F.3d 124, 129 (2d Cir. 2000)).

Further, an employee waives his right to sue under the FLSA when "(a) [ ] the employee

agree[s] to accept payment which the Secretary of Labor determines to be due and (b) that there

be payment in full, and both elements must be satisfied independently."  Zhengfang Liang v.

Café Spice SB, Inc., 911 F. Supp. 2d 184, 198 (E.D.N.Y. 2012) (quoting Parada v. Banco Indus.

de Venezuela, C.A., No. 10 Civ. 0883(SHS), 2011 WL 519295, at *9 (S.D.N.Y. Feb. 15, 2011)).

In this regard, 29 U.S.C. § 216(c) provides that "t]he Secretary is authorized to supervise the

payment of . . . the unpaid overtime compensation owing to any employee or employees under

section 206 or section 207 of this title, and the agreement of any employee to accept such

payment shall upon payment in full constitute a waiver by such employee of any right he may

have under subsection (b) of this section to such . . . unpaid overtime compensation and an

additional equal amount as liquidated damages."  See also Zhengfang Liang, 911 F. Supp. 2d at

198.  "[C]ourts that have determined that a plaintiff's FLSA claims were waived pursuant to a

DOL settlement have found that the waiver occurred pursuant to plaintiff's receipt of a WH–58

form, which contains explicit waiver language, or a similar form containing explicit waiver

language."  Id. at 198–99 (collecting cases).

## C. As to Whether the Opt-In Plaintiff Ruggiero Waived his Right to Sue under the FLSA and the NYLL

The Court first addresses whether Ruggiero has waived his right to participate in this

collective action.  In this regard, on August 7, 2009, he accepted a check from the Defendants for

unpaid overtime compensation as part of a DOL settlement.  When collecting his check at the

BPS corporate office in Bayport, he signed a WH-58 Form which clearly stated that by accepting the check, he had "given up any right [he] may have to bring suit for back wages" under the FLSA for "overtime compensation and liquidated damages, plus attorney's fees and court costs." (Rose Decl., Exh. F.)  The WH-58 Form further warned Ruggiero not to sign it "unless [he] actually [ ] received payment of all back wages due."  (Rose Decl., Exh. F.)  Nevertheless, despite this clear notice, Ruggiero signed the WH-58 Form, accepted the check from the Defendants and kept the money from the check.

In the Court's view, under these circumstances, Ruggiero has waived his right to sue under the FLSA.  Indeed, the evidence before the Court establishes that Ruggiero "agree[d] to accept payment which the Secretary of Labor determine[d] [was] due" and that Ruggiero received full payment from BPS.  Zhengfang Liang, 911 F. Supp. 2d at 198–99; Parada, 2011 WL 519295, at *9.  The evidence further establishes that Ruggiero signed the WH-58 Form.  As suggested above, the signing of a WH-58 form, pursuant to a DOL settlement and which contains explicit waiver language, is sufficient to constitute a waiver in accordance with 29 U.S.C. § 216(c).  See Zhengfang Liang, 911 F. Supp. 2d at 198–99.

Moreover, while Ruggiero now argues in a self-serving declaration that he was coerced into signing the WH-58 Form, he did not assert this during his deposition and there is no evidence in the summary judgment record to support his claim.  See Quiles v. City of New York, No. 11 CIV. 5613(FM), 2013 WL 5744322, at *14 (S.D.N.Y. Oct. 23, 2013) (quoting Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); see also Franco v. Ideal Mortg. Bankers, Ltd., No. 07–CV–3956 (JS)(AKT), 2011 WL 317971, at *9 n.8 (E.D.N.Y. Jan.

28, 2011) ("It is well-settled that a party cannot create a genuine issue of material fact by submitting a self-serving declaration that contradicts prior deposition testimony.").  As such, the Court grants summary judgment in favor of the Defendants as to Ruggiero's FLSA claims and dismisses Ruggiero as an opt-in plaintiff in the FLSA collective action.

However, the Court finds that Ruggiero has not waived his right to bring a claim under the NYLL.  This is because the WH-58 Form only contains a waiver with respect to FLSA actions; it says nothing about state law actions.  Therefore, the Court declines to dismiss Ruggiero's NYLL claim on this ground.

## D.  As to Whether The Plaintiff's FLSA Claim is Barred by the Statute of Limitations

Having dismissed Ruggiero's FLSA claim on the basis of Ruggiero's waiver, the Court will now consider whether the Plaintiff's FLSA claim is time-barred.  In this regard, on July 15, 2010, the Plaintiff retired from his job with BPS.  Thus, in order to bring a collective action under the FLSA's two-years statute of limitations, the Plaintiff was required to not only file a complaint but to also file his written consent form by July 15, 2012.  See Gonzalez v. El Acajutla, No. CV 04-1513(JO), 2007 WL 869583, at *5 (E.D.N.Y. Mar. 20, 2007) ("The case law, like the statute itself, requires named plaintiffs as well as others to submit a written consent to join in a collective action under the FLSA, and is not satisfied by the filing of the complaint itself."); see also Whitehorn, 767 F. Supp. 2d at 449.  However, the Plaintiff did not file his written consent form until April 22, 2013, months after the statute of limitations expired.  Accordingly, it appears to the Court that the Plaintiff's FLSA claim, brought as a collective action, is barred by the statute of limitations.  See Gonzalez, 2007 WL 869583, at *5 (granting summary judgment in favor of the defendants on statute of limitation grounds where a named

plaintiff failed to file a written consent to join an FLSA collective action when it was initially filed and more than two years had passed since his FLSA cause of action accrued).

Nevertheless, because the Plaintiff filed his written consent form prior to July 15, 2013, or within three years of his last date of employment with BPS, his FLSA collective action claim may survive provided he can prove that the Defendants acted willfully when they allegedly violated the FLSA. "An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act." Berrios v. Nicholas Zito Racing Stable, Inc., 849 F. Supp. 2d 372, 391 (E.D.N.Y. 2012) (quoting Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009)) (internal quotation marks omitted). In this regard, "[m]ere negligence on the part of the employer will not suffice." Id.

As indicated above, "[c]ourts in this Circuit have generally left the question of willfulness to the trier of fact." Litras v. PVM Intern. Copr., No. 11–cv–5695 (JFB)(AKT), 2013 WL 4118482, at *5 (E.D.N.Y. Aug. 15, 2013). However, "[i]n those instances where courts have found a lack of willfulness at the summary judgment stage, the FLSA violation was," as alleged here, "due to a misclassification of the plaintiff as being exempt." Berrios, 849 F. Supp. 2d at 391.

The problem for the Plaintiff in this case is that the summary judgment record contains no evidence that would suggest willfulness on the part of the Defendants in classifying the Plaintiff as an exempt employee. In fact, in his opposition to the Defendant's summary judgment motion, the Plaintiff does not even attempt to cite to any portion of the summary judgment record that might support his position in this regard. Of importance, "[a]n FLSA plaintiff seeking to invoke the three-year limitations period cannot survive a motion for summary judgment unless he 'makes a competent demonstration that there is a trialworthy issue as to

whether the employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" Clarke v. JPMorgan Chase Bank, N.A., No. 08 Civ. 2400(CM)(DCF), 2010 WL 1379778, at *10 (S.D.N.Y. Mar. 26, 2010) (quoting Lopez v. Corporacion Azucarera de P.R., 938 F.2d 1510, 1515–16 (1st Cir. 1991) (in turn, quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988))) (internal brackets omitted).

Instructive here is the courts' decision in Gustafson v. Bell Atlantic Corp., 171 F. Supp. 2d 311 (S.D.N.Y.  2001).  In Gustafson, the court declined to apply the three-year statute of limitations to the plaintiff's FLSA claim. Id. at 324.  The Gustafson court reasoned that "the plaintiff d[id] not offer sufficient evidence to carry his burden of proving a willful or reckless violation of the FLSA," in that he, like the Plaintiff in this case, "only speculate[d] that the [defendant] [c]ompany willfully attempted to conceal [the] plaintiff's eligibility for overtime pay by hiring him as an independent contractor." Id. at 323.  Further, the court held that the "plaintiff offered no credible evidence to support his argument that [the] defendants were reckless in failing to determine whether [the] plaintiff was eligible for overtime pay under the FLSA," but instead "merely concluded that willfulness and recklessness existed, without pointing to any concrete evidence in the record." Id. at 323–24.  See also Clarke, 2010 WL 1379778, at *12–13 ("Here, [the] [p]laintiff Clarke has not raised any genuine issue about whether the [Defendant's] alleged noncompliance with the FLSA was willful. . . . [He] has made no factual showing here. He has not raised any genuine issue about whether [the defendant] *willfully* violated the FLSA's overtime provisions.  Thus, the two-year of limitations governs Clarke's FLSA claim, the claim is barred, and [the Defendant] is entitled to summary judgment.") (emphasis in the original).

28

Similarly, because the Plaintiff in this case has offered no proof to establish that the Defendants either knew or recklessly disregarded FLSA requirements when it classified him as an exempt employee, the Court finds that the three-year statute of limitations does not apply to the Plaintiff's FLSA collective action claim.  See Edwards v. City of New York, No. 08 Civ. 3134(DLC), 2011 WL 3837130, at *5 (S.D.N.Y. Aug. 29, 2011) (declining to apply the three-year statute of limitations to the plaintiffs' FLSA claim where the "plaintiffs rel[ied] solely on the conclusory assertions in their complaint" and "ha[d] not identified any evidence that [the] defendant had actual knowledge of or acted with reckless disregard for its obligations under the FLSA").  See also Reyes v. New York City Health and Hospitals Corp., No. 10–CV–1606 (WFK)(JMA), 2012 WL 3764061, at *4 (E.D.N.Y. Aug. 29, 2012) (granting the defendants motion for summary judgment and dismissing the Plaintiff's Family Medical Leave Act ("FMLA") claim as time-barred where the plaintiff "set[ ] forth no facts to demonstrate [the] [d]efendants' conduct was 'willful'" in that she "ha[d] not provided evidence [that the] [d]efendants had actual knowledge they were violating the FMLA").

However, while the Court has determined that this case is governed by FLSA's two-year statute of limitations, and therefore, that the Plaintiff's April 22, 2013 written consent was filed too late, the Court still finds that the Plaintiff's FLSA claim survives on the basis of his April 30, 2012 declaration, which was made in connection with his motion to compel responses to interrogatories.  Of importance, in this declaration, the Plaintiff affirmatively states that he is the above named Plaintiff in this action.  (Dkt. No. 16–3, ¶ 1.)

As one court in this Circuit has noted, "[t]he purpose of [the] consent requirement, presumably, is to put the [d]efendants on notice" and "to ensure that each plaintiff intends to participate in the case, and is not simply a procedural figurehead for an enterprising class action

lawyer." D'Antuono v. C & G of Groton, Inc., No. 3:11cv33 (MRK), 2012 WL 1188197. at *2

(D. Conn. Apr. 19, 2012).  "While it is clear that some document in addition to the complaint

must be filed, it is not clear what form the written consent must take, especially when the alleged

party plaintiff is a named plaintiff."  Id.  The Court notes that the question of whether a

declaration like the one at issue here may constitute a plaintiff's written consent "is a close one,

and one which would not have arisen had [the Plaintiff's] counsel simply ensured that a written

consent form was filed along with the complaint."  Id. at *4.  Nevertheless, "courts have

generally not taken a strict approach with regard to the *form* of the written consent, at least with

respect to named plaintiffs."  Mendez v. The Radec Corp., 260 F.R.D. 38, 52 (W.D.N.Y. 2009)

(emphasis in original).

　　　　Here, the Court finds that the statement contained in Paragraph 8 of the declaration and

relied on by the Plaintiff makes no indication that the Plaintiff was intending to join a collective

action and is merely an allegation against the Defendants with respect to the hours he and other

employees worked and their lack of overtime compensation.  However, in Paragraph 1 of the

declaration, the Plaintiff clearly identifies himself as the named Plaintiff in this action.

Moreover, the caption for the declaration states that the Plaintiff is bringing the action on behalf

of himself and other employees similarly situated.  Other courts have found such circumstances

sufficient to constitute a written consent for the purpose of satisfying the FLSA statute of

limitations requirements.  See, eg., D'Antuono, at *4 ("read[ing] [the plaintiff's] affidavit

broadly as implicitly verifying the complaint, expressing an interest that legal action be taken to

protect her rights, and expressing an interest in being a party plaintiff"); Mendez, 260 F.R.D. at

52 ("In [his] affirmation, [the plaintiff] stated, inter alia, 'I am the Named Plaintiff in the above-

captioned matter.'  The caption also named [the plaintiff] as plaintiff, 'on behalf of himself and

all other employees similarly situated.'  That clearly indicates [the plaintiff's] understanding that he was consenting to be a plaintiff in this collective action under the FLSA.  Accordingly, I conclude that it satisfied the written-consent requirement of § 216(b).").

Accordingly, the Court accepts the Plaintiff's April 30, 2012 declaration as his written consent to join this collective action.  As a result, the Plaintiff's FLSA collective action claim is not time-barred and the Court denies the Defendants' motion for summary judgment on this ground.

**E.  As to Whether the Plaintiff was an Exempt Employee under the FLSA**

Since the Plaintiff's FLSA claim is not barred by the statute of limitations, the Court must now determine whether the Defendants have demonstrated that the Plaintiff was an exempt employee under the FLSA and that no triable issues of material fact exist.  In the Court's view, the Defendants have not satisfied their burden and are therefore, not entitled to summary judgment.

**1.  Executive Employee Exemption**

First, the Defendant argues that the plaintiff is exempt from FLSA requirements under the executive employee exemption.  As discussed above, an employee will be considered exempt if (1) he is "compensated on a salary basis at a rate not less than $455 per week"; (2) his "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) he "customarily and regularly directs the work of two or more other employees"; and (4) he "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a).

In this case, the parties do not dispute the first prong has been met, but do disagree as to whether the second, third and fourth prongs have been satisfied.

With respect to the second prong, the Defendants have failed to address whether these responsibilities were the Plaintiff's primary duty when he was serving as the assistant manager to the Mineola Branch.  In this regard, the Defendants have provided an exhaustive list of the alleged duties of the Plaintiff that constitute management.  However, "far from a comprehensive record of [the Plaintiff's] managerial activity," the Defendants rely primarily of the Plaintiff's deposition testimony and "put[ ] forth no affidavits or deposition testimony from [the Plaintiff's] supervisors" or other employees at the Mineola Branch save for Ruggiero.  Clougher, 696 F. Supp. 2d at 291.  As a consequence, "[t]he material disputes of fact resulting from the undeveloped summary judgment record become manifest in even the most cursory 'primary duty' analysis, as illustrated briefly below."  Id.

To reiterate from above, in order to determine whether the Plaintiff's performance of managerial tasks was his primary duty, the Court considers (1) "the relative importance of the exempt duties as compared with other types of duties"; (2) the amount of time spent performing exempt work"; (3) the employee's relative freedom from direct supervision"; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  C.F.R. §541.700(a).  "Consideration of these factors is a highly fact-intensive inquiry, 'to be made on a case-by-case basis in light of the totality of the circumstances.'"  Clougher, 696 F. Supp. 2d at 290 (quoting Johnson v. Big Lots Stores, Inc., 604 F. Supp. 2d 903, 908 (E.D.La. 2009)).

Here, viewing the facts in the light most favorable to the plaintiff, as the non-moving party, questions of fact exist as to all four of these considerations.  Indeed, "there are too many

32

factual disputes—regarding how [the] Plaintiff[ ] allocated [his] time and under whose direction;

the proper characterization of [the] Plaintiff['s] various responsibilities; and the relative import

of such responsibilities to the [Defendants]—for the Court to conclude, as a matter of law, that

management was [the] Plaintiff['s] 'primary duty.'"   Martinez v. Hilton Hotels Corp., 930 F.

Supp. 2d 508, 524 (S.D.N.Y. 2013).  In this regard, the parties disagree as to the degree of which

the Plaintiff exercised certain managerial responsibilities, if at all; whether his position of

assistant manager was limited in scope; the extent in which his duties involved simply doing the

work of an inside salesperson; and the amount his manager supervised him.  "Selecting which of

the[ ] different depictions of [the] Plaintiff['s] responsibilities to credit is a task for the jury, not

the Court."  Id. at 525.  The Court also points out that the Plaintiff's salary was comparable to

that of inside salesperson and did not increase as a result of him being promoted to assistant

manager.  This would be contrary to the Defendants' position that the Plaintiff was exempt under

the executive employee exemption.  Id.  See also Costello v. Home Depot USA, Inc., 928 F.

Supp. 2d 473, 495 (D. Conn. 2013); Clougher, 696 F. Supp. 2d at 291–94.

     Similarly, although the Defendant attempts to point to ways in which the Plaintiff

directed the work of two or more other employees, they do not establish that he "customarily and

regularly" did so and the Plaintiff disputes that this was the case.  Thus, the third prong of the

executive employee exemption "that an exempt employee 'customarily and regularly' directs the

work of two or more employees—also cannot be resolved on summary judgment because the

extent of Plaintiff['s] authority over the [other employees at the Mineola Branch is disputed."

Martinez, 930 F. Supp. 2d at 527.

     Concerning the final prong, the Defendants do not suggest that the Plaintiff had the

authority to hire or fire other employees, but that his suggestions and recommendations regarding

33

hiring, firing, advancement and promotion were given "particular weight."   However, the Plaintiff contests this assertion by the Defendant.  In the Court's view, there is ample evidence before it to support either party's position.  For example, on the one hand, the Plaintiff arguably played some part in Montana's promotion to an inside salesperson.  On the other hand, it is quite clear that the Plaintiff's opinion with respect to Ruggiero was ignored when the Defendants decided to terminate his employment.  As such, again, this sort of factual dispute should be resolved by a jury.  Id. at 527–28.

In sum, triable issues of material fact exist as to whether the Plaintiff was exempt from FLSA's overtime requirements pursuant to the executive employee exemption.  Therefore, the Defendants' motion for summary judgment on this basis is denied.

### 2.  Administrative Employee Exemption

The Defendants also argue that the Plaintiff was exempt under the administrative employee exemption.  Under this exemption, as aforementioned, FLSA's overtime requirements are inapplicable to employees (1) who are "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  The Defendants assert that the evidence establishes all three of these prongs.  The Court disagrees and finds that only the first prong, which is uncontested by the Plaintiff, has been satisfied.

First, in contrast with the Defendants, the Plaintiff contends that his primary duty did not entail non-manual work directly related to the management or general business operations of the Defendants or of their customers, but rather involved the work of an inside salesperson, which

would not be covered under the administrative employee exemption.  See Reiseck v. Univ. Comm. Of Miami, Inc., 591 F.3d 101, 108 (2d Cir. 2010) ("[A]n employee making specific sales to individual customers is a salesperson for the purposes of the FLSA, while an employee encouraging an increase in sales generally among all customers is an administrative employee for the purposes of the FLSA."); see also Gorey v. Manheim Services Corp., 788 F. Supp. 2d 200, 208 (S.D.N.Y. 2011) (same).  Thus, as with the executive employee exemption, the issue of whether the administrative exemption applies to the Plaintiff "cannot be resolved at this stage of the litigation, because there exist disputed issues of material fact over whether [the Plaintiff's] 'primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of [the Defendants or the Defendants'] customers.'" Hendricks v. J.P. Morgan Chase Bank, N.A., 677 F. Supp. 2d 544, 559 (D. Conn. 2009).

Further, "[t]here is sharp disagreement concerning critical facts regarding the scope of [the] Plaintiff's duties, and whether those duties allow [the] Plaintiff to exercise the discretion and judgment required to characterize [his] position as exempt" under the administrative employee exemption.  Harper v. Government Employees Ins. Co., 754 F. Supp. 2d 461, 465–66 (E.D.N.Y. 2010).  Indeed, the Plaintiff and the Defendants disagree as to how much discretion and decision-making authority the Plaintiff had and how much he had to defer to the manager of the Mineola branch concerning matters of significance.  Accordingly, since "[t]he Second Circuit has indicated a very narrow interpretation of the FLSA administrative exemption, and this [C]ourt's holding can be determined only upon a clear finding of facts," the Court must deny summary judgment, for "the Plaintiff has raised important questions concerning those facts[.]" Id.

Therefore, in light of the triable issues of material fact that exist in this case, the Court cannot hold, as a matter of law, that the Plaintiff is an administrative employee exempt from the requirements of the FLSA.  The Defendants' motion for summary judgment on this basis is denied.

### 3.   The Combination Exemption

Lastly, the Defendants argue that that the Plaintiff is exempt from the FLSA overtime requirements based on the "combination exemptions," "which requires that an employee's 'primary duty involve [ ] a combination of exempt . . . work.'"  Arasimowicz v. All Panel Systems, LLC, at *10 (D. Conn. June 5, 2013) (quoting 29 C.F.R. 541.708).  However, for the same reasons discussed above in connection with the executive and administrative employee exemptions, the Court finds that summary judgment is inappropriate.  There exists triable issues of material fact in this case that are best suited for resolution by a jury, particularly with respect to whether the Plaintiff's primary duty involved sales or involved managerial responsibilities.

In this regard, the Court finds the reasoning of the court in Rubery v. Buth-Na-Bodhaige, Inc., 470 F. Supp. 2d 273 (W.D.N.Y. 2007) to be particularly applicable to the present case.  In Rubery, the Court held:

> [The] defendant has failed to establish, as a matter of law, that [the plaintiff's] primary duty was management.  There are facts which could lead to such a conclusion, but there are other facts that indicate the contrary.  To some extent, issues of credibility may be involved in the final resolution of this issue. There are questions as to what [the] plaintiff actually did during [his] workday and what type of independent authority [he] had.  In sum, [ ] it is a question of fact for the jury as to whether [the] plaintiff's primary job responsibilities could be considered managerial, thereby exempting her from the FLSA overtime requirements.

Id. at 277.   Such is the case here.  Therefore, the Court will allow the Plaintiff to proceed forward with his FLSA claim.

**F.  As to Whether the Plaintiff is Precluded from Filing a Motion for Collective and/or Class Action**

As a final matter, the Court will address the Defendant's argument that the Plaintiff should be precluded from filing a motion for collective and/or class action at this stage of the litigation.   However, it appears that Courts in this Circuit have considered motions for certification of a collective action or of a Fed. R. Civ. P. 23(g) class even after discovery has been completed.  See, e.g., Hendricks v. J.P. Morgan Chase Bank, N.A., 263 F.R.D. 78, 83 (D. Conn. 2009); Eng-Hatcher v. Spring Nextel Corp., No. 07 Civ. 7350(BSJ), 2009 WL 7311383, at *2 (S.D.N.Y. Nov. 13, 2009); DiFilippo v. Barclays Capital, Inc., No. 05 Civ. 4990 VM JCF, 2006 WL 1716860, at *3–6 (S.D.N.Y. June 20, 2006).  As to the Defendants other contentions, such as that the Plaintiff is not similarly situated to other prospective class members, the Court shall address these issues when the Plaintiff makes his motion for certification of a collective action and/or class pursuant to Fed. R. Civ. P. 23.

### III.  CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the Defendants' motion for summary judgment as to the opt-in Plaintiff Ruggiero's FLSA claim is granted, because he waived his right to sue under the FLSA. However, he may proceed on his NYLL claim; and it is further

**ORDERED**, that the Defendants' motion for summary judgment as to the Plaintiff Callari is denied.  The Plaintiff is permitted to proceed with his FLSA claim and may move to certify a collective action and/or a class action pursuant to Fed. R. Civ. P. 23.

**SO ORDERED.**

Dated: Central Islip, New York
December 19, 2013                                              */s/ Arthur D. Spatt*
                                                                                ARTHUR D. SPATT
                                                                    United States District Judge